## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

| | |
|---|---|
| Campbell Property Management, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>Hiscox, Inc.,<br><br>Defendant. | **Case No. 3:18-cv-00237-DLH-ARS** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANT'S MOTION TO DISMISS

**[¶1]**   Plaintiff Campbell Property Management, LLC ("CPM") submits this brief in opposition to Defendant Hiscox, Inc.'s ("Hiscox") motion to dismiss.

### FACTUAL BACKGROUND

**[¶2]**   CPM is a professional property management company that provides professional service management to 54 separate business entities.

**[¶3]**   As the professional property management company for the 54 separate business entities, CPM has a fiduciary obligation overseeing the operating accounts of the 54 separate entities, particularly as to income, expenses, and rental security deposits.

**[¶4]**   CPM has been insured since 2009 under a Hiscox Professional Liability Errors and Omissions Insurance policy.

**[¶5]**   Consistent with that pattern, Hiscox issued to CPM an insurance policy providing insurance coverage from the period of March 15, 2017, through March 15, 2018. The policy provided liability coverage up to $2,000,000.00 with a $1,000.00 deductible.

1

**[¶6]** The policy provided coverage for claims made against CPM acting in its role as a property manager. The original certificate number was MPL1092583.17, with a renewal policy number of MPL1092583.18.

## UNDERLYING LOSS FACTS

**[¶7]** As the property manager for these 54 separate business entities, CPM created separate Client Accounts, including a checking account and a savings account for each entity. The Client Accounts were used to handle income, expenses, and rental deposits. At all times, these accounts were the property of CPM clients. The Client Accounts were handled by CPM as a fiduciary to the 54 business entities.

**[¶8]** The majority of the Client Accounts were handled through accounts with Choice Financial, a Fargo, North Dakota bank.

**[¶9]** CPM was contacted by Choice Financial on January 12, 2018, regarding the Client Accounts held at the bank.

**[¶10]** The President of Choice Financial informed CPM that Choice Financial had determined electronic transfers were going from Client Accounts of CPM to a personal account in the name of CPM's controller, Mickey Haarstad ("Haarstad").

**[¶11]** Choice Financial notified CPM of 155 wrongful electronic transfers made between September 29, 2014 and January 9, 2018 regarding Client Account funds being diverted to Haarstad.

**[¶12]** These electronic transfers totaled $1,294,967.58.

**[¶13]** That same afternoon, January 12, 2018, CPM locked-down its accounting software system and contacted all of its banking institutions to remove any authority level or access Haarstad had with those banking institutions on behalf of CPM Client Accounts.

**[¶14]** Haarstad electronically transferred Client funds into her personal bank account at Choice Financial on her own accord and no owner, member, director, officer, or manager of CPM

had any knowledge of her wrongdoing until informed by Choice Financial on January 12, 2018. These funds were not the separate property of CPM, but were held by CPM as a fiduciary providing the professional services of property management for the 54 separate entities.

[¶15] CPM acted reasonably to safeguard its Client's funds by setting up separate accounts at the bank for each of the 54 separate entities. The funds were never kept at CPM or commingled in any CPM operating accounts. The funds were not kept in a safe. Instead they were deposited in banks. The funds were never commingled in any way with the accounts from other entities or CPM. Mickey Haarstad was a long-time employee and there was no indication until January 12, 2018 that there any issue with management of funds.

[¶16] There was no comingling of Client funds by CPM as it had separate Client Accounts at the bank for each of the 54 separate entities.

## LAW AND ARGUMENT

### A. Rule 12(b)(6) Motion Standard

[¶17] "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Stodghill v. Wellston Sch. Dist., 512 F.3d 472, 476 (8th Cir. 2008) (citation omitted). In analyzing the adequacy of a complaint under Rule 12(b)(6), the court must accept as true all the complaint's factual allegations and view them in the light most favorable to the plaintiff. Id. A Rule 12(b)(6) motion "will succeed or fail based upon the allegations contained in the face of the complaint." Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992).

[¶18] However, a Rule 12(b)(6) motion must instead "be treated as a motion for summary judgment when matters outside the pleadings are presented and not excluded by the trial court." Id. "Matters outside the pleading" include any "written or oral evidence in support or in opposition

to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." Id. (citation omitted).

[¶19] Hiscox's motion includes matters outside the pleadings in the form of attached exhibits, references to correspondence and claims notices, and inadmissible hearsay. Accordingly, because Hiscox's motion to dismiss includes evidence outside the scope of the pleadings, it must be converted to a summary judgment motion unless the Court chooses to exclude such evidence.

[¶20] "Summary judgment is proper if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Murray v. Greenwich Ins. Co., 533 F.3d 644, 648 (8th Cir. 2008) (citing Fed.R.Civ.P. 56(c)). "When ruling on a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party;" however, the nonmoving party "must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial." Id. (quotations and citations omitted).

[¶21] Insofar as the Court treats Hiscox's motion as a true Rule 12(b)(6) motion, all facts alleged in CPM's Complaint must be taken as true. As such, Hiscox motion must fail as Campbell has set forth facts in support of its claim which would entitle CPM to relief.

[¶22] Nevertheless, even if the Court treats the motion as one for summary judgment, Hiscox cannot merely rely on the pleadings, and instead must provide admissible, competent evidence supporting its claim. Hiscox has failed to introduce any admissible evidence to support its claims, and instead relies on inadmissible hearsay. Thus, the motion should be denied.

### B. The Burden to Prove Coverage is on the Insured; Burden to Prove Exclusions is on the Insurer.

[¶23] "Insurance policy interpretation is a question of law." Borsheim Builders Supply, Inc. v. Manger Ins., Inc., 2018 ND 218, ¶ 8, 917 N.W.2d 504, 508 (citation omitted). As the North

Dakota Supreme Court has explained, in construing an insurance contract to decide whether coverage exists, a court will give effect to the parties' mutual intention at the time of contracting:

> We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction. If coverage hinges on an undefined term, we apply the plain, ordinary meaning of the term in interpreting the contract. While we regard insurance policies as adhesion contracts and resolve ambiguities in favor of the insured, we will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage. We will not strain the definition of an undefined term to provide coverage for the insured. We construe insurance contracts as a whole to give meaning and effect to each clause, if possible. The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.

Id. (citation omitted). "Exclusions from coverage . . . must be clear and explicit and are strictly construed against the insurer." Id. (citation omitted). Such provisions will not be rewritten to impose liability when the policy unambiguously precludes coverage. Id. "If and only if a coverage provision applies to the harm at issue will the court then examine the policy's exclusions and limitations of coverage." Id. (citation omitted).

[¶24] The North Dakota Supreme Court has explained that in interpreting an insurance policy, the Court first examines its coverage before its exclusions. Id. at ¶ 9. "It is axiomatic that the burden of proof rests upon the party claiming coverage under an insurance policy." Id. at ¶ 10 (citation omitted). However, "[w]hile the insured bears the initial burden of demonstrating coverage, the insurer carries the burden of establishing the applicability of exclusions." Id. (citation omitted).

[¶25] Here, it is undisputed the harm at issue arises out of CPM's property management services. (See Doc. ID # 1-1, p. 6; Doc. ID # 3, p. 2). Hiscox recognizes that this is a covered claim as it regards CPM. CPM was insured for professional liability as to its acts in the performance of professional services. Hiscox does not dispute CPM has met its burden of making a claim that is

covered under such policy. (Doc. ID # 3, p. 2). Therefore, CPM has met its burden of proof. As such, the burden of proving an exclusion applies rests on Hiscox.

[¶26] For the reasons set forth below, Hiscox's claims for exclusion fail regardless whether the Court rules on the motion under Rule 12(b)(6) or Rule 56.

## I.     The "Commingling of or Inability or Failure to Safeguard Funds" Exclusion Does Not Preclude Coverage for the Underlying Claims.

[¶27] Hiscox argues CPM's insurance policy excludes coverage for this claim because Haarstad's embezzlement constitutes a commingling of and inability or failure to safeguard funds. Hiscox cites Endorsement 7, "E451.2 Property Management Services Endorsement" (See Doc. ID # 1.1, p. 36-37) to support its argument that the Policy excludes coverage for claims "based upon or arising out of any actual or alleged commingling of or inability or failure to safeguard funds." Hiscox's argument fails because the ordinary meaning of "commingling" does not apply to Haarstad's conduct, and Hiscox has failed to provide any admissible evidence that CPM failed to safeguard funds.

### A.  Commingling

[¶28] There was no commingling of funds by CPM. At all times, CPM has maintained separate designated accounts for each of the separate entities it manages. Haarstad fraudulently stole funds from various accounts in control of CPM for her own personal use. There is nothing in CPM's Complaint suggesting any funds were commingled.

[¶29] "Commingle" is not defined in the Policy and the term is not a technical insurance term with a strict legal meaning.

> Absent a contractual definition or a strict technical usage, we apply the plain, ordinary meaning of an undefined term to the insurance policy. (citation omitted). The dictionary is a good source to determine the plain, ordinary definition of an undefined term. Martin, 1998 ND 8, ¶ 12, 573 N.W.2d 823 (noting the ordinary meaning is the definition a non law-trained person would attach to the term). See, e.g., Kim–Go v. J.P. Furlong Enters.,

6

> Inc., 460 N.W.2d 694, 696 (N.D.1990) (relying on a dictionary to define "proportion"); Hofco, Inc. v. National Union Fire Ins., 482 N.W.2d 397, 401 (Iowa 1992) (remarking a court will commonly refer to dictionaries in searching for the ordinary meaning of an undefined term).

Hanneman v. Cont'l W. Ins. Co., 1998 ND 46, ¶ 31, 575 N.W.2d 445, 451.

[¶30] Haarstad's misappropriation of funds does not constitute commingling. As recognized by Hiscox, commingling is defined as "the mixing together; esp[ecially] a fiduciary mixing of personal funds with those of a beneficiary or client." BLACK'S LAW DICTIONARY 306 (9th ed. 2009); (Doc. ID # 3, p. 6). The essence of commingling is the improper mixing funds which make it difficult to determine which funds belong to the client, and is commonly brought up in the context of attorney-client relationships in which an attorney has commingled client funds with the firm's operating account. See In re Disciplinary Action Against Matson, 2015 ND 222, ¶ 28, 869 N.W.2d 128, 134 (citing In re Caskey, 866 So. 2d 226, 227 (LA 2004)).

[¶31] Alternatively, embezzlement is defined as "the fraudulent taking of personal property with which one has been entrusted, esp[ecially] a fiduciary." BLACK'S LAW DICTIONARY 599 (9th ed. 2009). Misappropriation is defined as the "application of another's property or money dishonestly to one's own use." BLACK'S LAW DICTIONARY 108 (9th ed. 2009).

[¶32] This is not a case where finances were mis-managed or improperly accounted for. This is a case where funds were fraudulently stolen from client accounts by an employee of CPM. Under Hiscox's interpretation of commingling, any theft by an employee of a fiduciary from a client would be considered commingling.

[¶33] Hiscox erroneously relies on a series of cases from other jurisdictions to support its argument that Haarstad's actions constitute "commingling" that must be imputed on CPM.

[¶34] Hiscox cites Fid. Nat. Title Ins. Co. of New York v. OHIC Ins. Co., 619 S.E.2d 704, 705 (2005) to support its argument that Haarstad's acts must be imputed on CPM. In Fidelity,

the court held the insurer was not liable for coverage based on the undisputed misappropriation by one employee. Id. at 708. Significantly, the policy provision at issue disclaimed coverage to any "claims based upon or arising out of conversion, misappropriation, or improper commingling of client funds" and there was no exception for an "innocent" insured for those types of claims. Id. at 706. More significantly, however, is the facts giving rise to the undisputed misappropriation in Fidelity included one employee embezzling funds from client accounts for personal use. The insurer disclaimed coverage on the basis that the funds were misappropriated, which was explicitly precluded from coverage in the applicable exclusion. Id. at 708. Unlike CPM's Policy with Hiscox, there is no exclusion for misappropriation at issue here.

[¶35] Hiscox cites to Chicago Title Ins. Co. v. Northland Ins. Co., 31 So. 3d 214, 215 (Fla. Dist. Ct. App. 2010) for the same proposition. Like in Fidelity, the Chicago court found coverage was properly excluded for undisputed misappropriation when an attorney/employee misappropriated money that was supposed to be used for a client. See id. 215-17. The policy at issue specifically excluded coverage for commingling, conversion, misappropriation, or defalcation. Id. at 216. It was undisputed the attorney misappropriated the clients funds and the insurer rightfully disclaimed coverage.

[¶36] The cases cited by Hiscox are not instructive to this case. First, there is no evidence of comingling of funds in either the cases cited by Hiscox, or by Haarstad in this case. Notably, the cases cited by Hiscox, in which the employees' conduct was found to constitute misappropriation, involved the same course of conduct that Haarstad engaged in in this case: taking client funds and putting them in the employee's own account. Second, because it is clear Haarstad fraudulently misappropriated or embezzled client funds, her wrong-doing cannot be imputed on CPM under the express language found in the Policy Section V(A)(2). That section provides the exclusion for allegedly fraudulent, dishonest, or knowingly wrongful conduct under V(A) shall

not apply to any Individual Insured who did not commit or participate in such fraudulent, dishonest, criminal, or knowingly wrongful, malicious, or deliberate acts or omissions. (Doc ID # 1-1 at p. 19). Accordingly, the exclusion for coverage only applies to Haarstad; the named insured, CPM, and all other Individual Insureds are entitled to coverage under this provision for Haarstad's fraudulent and knowing wrongful acts.

[¶37] Hiscox has failed to submit any admissible evidence of commingling by CPM, and therefore, summary judgment on this issue is inappropriate. Insofar as the motion is taken under Rule 12(b)(6), the following allegations in Complaint must be taken as true:

- As the property manager for these 54 separate business entities, CPM created separate Client Accounts, a checking account and a savings account, for each of these 54 separate entities at various banks.

- The Client Accounts were used to handle income, expenses and rental deposits. At all times, these accounts were the property of CPM clients.

- The Client Accounts were handled by CPM as a fiduciary to the 54 business entities.

- The majority of the Client Accounts of CPM were handled through accounts with Choice Financial, a Fargo, North Dakota bank.

- CPM acted reasonably to safeguard its Client's funds by setting up separate accounts at the bank for each of the 54 separate entities.

- There was no comingling of Client funds by CPM as it had separate Client Accounts at the bank for each of the 54 separate entities.

(Doc. ID # 1-1, pp. 2-4).

[¶38] Because CPM has set forth facts set in support of its claim which would entitle it to relief, dismissal under Rule 12(b)(6) is also inappropriate.

### B. *Inability to Safeguard*

[¶39] Hiscox argues the fact that funds were embezzled by Haarstad is de facto inability to safeguard funds under the terms of the Policy. However, beyond this conclusory allegation,

Hiscox has failed to introduce any admissible evidence supporting its claim. CPM safeguarded funds by insuring the funds and keeping each entities' funds in separate designated bank accounts at FDIC-insured institutions.

[¶40] The Policy does not define "safeguard assets" nor is it an insurance term with a strict legal meaning. Nevertheless, there are many common-sense applications of the term. Merriam-Webster defines "safeguard" as a precautionary measure, stipulation, or device.[1] In terms of safeguarding company assets, one of the "most obvious ways to safeguard a company asset is to insure it so that it can be . . . replaced."[2] In addition, when it comes to keeping funds for a client in a fiduciary capacity, keeping each client's funds in their own separate account is imperative. See generally Matter of Application for Disciplinary Action Against Lee, 283 N.W.2d 179, 183 (N.D. 1979) (requiring that an attorney maintain a separate account into which a client's funds are deposited and kept separate from the attorney's personal or office funds). As the Lee case provides, the safeguard requirement is met by keeping funds in separate accounts.

[¶41]   Hiscox relies on a series of cases outside our jurisdiction and unpublished opinions to support its contention that CPM failed to safeguard funds. See CTA8 Rule 32.1A ("Unpublished opinions are decisions a court designates for unpublished status. They are not precedent… Unpublished opinions issued before January 1, 2007, generally should not be cited.").

[¶42] In PNA, the insured hired an employee who was later caught embezzling money from clients by altering checks and making unauthorized charges for his personal use. PNA, L.L.C. v. Interstate Ins. Grp., No. CIV.A. 02-1130, 2003 WL 21488120, at *1 (E.D. La. June 20, 2003); (See CTA8 Rule 32.1A "Unpublished opinions issued before January 1, 2007, generally should

---

[1] https://www.merriam-webster.com/dictionary/safeguard?utm_campaign=sd&utm_medium=serp&utm_source=jsonld
[2] Ashe-Edmunds, Sam. "Examples of Safe Guarding of a Company's Assets." Small Business - Chron.com, http://smallbusiness.chron.com/examples-safe-guarding-companys-assets-11712.html.

not be cited"). The insurer disclaimed first-party coverage and relied upon exclusions which provided no coverage for claims "arising out of or in any way connected to... any conversion, misappropriation, commingling, or defalcation of funds...failure to pay fees...or inability or failure to pay money held for others." Id. at 2. Nowhere did the exclusion provide exclusion for failure to safeguard funds.

[¶43]   In Philadelphia Indem. Ins. Co. v. Stazac Mgmt., Inc., No. 3:16-CV-369-J-34MCR, 2018 WL 2445816, at *1 (M.D. Fla. May 31, 2018), PIIC, an insurance company, brought an action for declarations regarding its duty to indemnify their insured, Stazac Management, Inc. Stazac was ran by Lauren and Ronald Carr. Id. The claims at issue arose from the Carr's mismanagement of client funds in their role as property managers of a homeowners association. Id. at *3. Following an audit, it was discovered the Carrs had misappropriated funds. Id. at **3-4. The court found PIIC did not have to indemnify the claims because the Carr's misappropriation and failure to handle the funds properly was a failure to safeguard funds. Id. at *14.

[¶44]   A similar situation occurred in Fid. Nat'l Title Ins. Co. v. Maxum Indem. Co., No. CV 16-1360, 2017 WL 4048162, at *7 (E.D. Pa. Sept. 12, 2017), when an insurer was sued for failure to indemnify a claim. The insured's president/owner misappropriated funds from several mortgage transactions to his personal bank account. Id. at *1. The insurance policy specifically excluded coverage for any claim "alleging, arising out of, based upon, relating to, or attributable to, directly or indirectly, any ... commingling of funds or accounts, inability to pay or failure to safeguard funds." Id. at *7. The Court found coverage was properly disclaimed for failure to safeguard funds when improper transfers were made between the operating and escrow accounts by the insured's president. Id. at **7-8.

[¶45]   In Bankers, the insurer issued an errors and omissions policy to its insureds, Robert Pierce and Preferred Realty. Bankers Multiple Line Ins. Co. v. Pierce, 20 F. Supp. 2d 1004, 1005

11

(S.D. Miss. 1998). The act that brought rise to the insureds claim was one of the insureds' employees— who was in charge of collecting unit deposits and rents, and holding funds in escrow— misappropriated and converted client funds. Id. Several state court judgments were entered against the insureds, and their insurer sought declaratory judgment on its duty to indemnify, arguing the express exclusions of the policy precluded the insureds from seeking coverage for the alleged negligent supervision of the wrong-doing employees. Id. The relevant exclusionary provision provided no coverage for claims:

> arising out of a dishonest, fraudulent, criminal or malicious act, error, or omission, if committed by, at the direction of, or with the knowledge of the Insured. (This Exclusion does not apply to an Insured who did not personally participate in committing such an act or omission and who, upon having knowledge of the act or omission, reported it) … [and claims] arising out of the conversion, misappropriation, commingling, or defalcation of funds or other property.

Id. at 1006. The court held the exclusion for claims arising out of the conversion. . . defalcation of funds or other property applied even though state court judgments against insured were based upon "negligent supervision" of employee who engaged in excluded conduct. Id. at 1008. Nowhere did the exclusion provide exclusion for failure to safeguard funds.

[¶46]   Hiscox reliance on these cases is misplaced. In regards to Fidelity and Philadelphia, the factual bases are substantially different than this case. In those cases, coverage was properly disclaimed, as logically it would not make sense for the owner of a company to steal funds for personal use, and then claim the loss to insurance and recoup the money he or she fraudulently stole in the first place. A relevant here, David Campbell is not the one who embezzled funds.

[¶47]   In regards to PNA and Bankers, they are equally inapplicable because the findings were made as to misappropriation, not failure to safeguard funds, which is at issue here. In addition, Hiscox has failed to provide any admissible evidence that CPM failed to safeguard funds. Instead,

Hiscox makes the conclusory allegation that the fact funds were embezzled from CPM's control is de facto inability to safeguard funds.

[¶48] As Hiscox has failed to support its argument with any admissible evidence, summary judgment is inappropriate and it is clear there is a factual dispute as to whether CPM adequately safeguarded its clients' funds.

[¶49] Insofar as the motion is taken under Rule 12(b)(6), the following allegations in the Complaint must be taken as true:

- As the property manager for these 54 separate business entities, CPM created separate Client Accounts, a checking account and a savings account, for each of these 54 separate entities at various banks.

- The Client Accounts were used to handle income, expenses and rental deposits. At all times, these accounts were the property of CPM clients.

- The Client Accounts were handled by CPM as a fiduciary to the 54 business entities.

- The majority of the Client Accounts of CPM were handled through accounts with Choice Financial, a Fargo, North Dakota bank.

- CPM acted reasonably to safeguard its Client's funds by setting up separate accounts at the bank for each of the 54 separate entities.

- There was no comingling of Client funds by CPM as it had separate Client Accounts at the bank for each of the 54 separate entities.

(Doc. ID # 1-1, pp. 2-4).

[¶50] In addition, it is undisputed that CPM took out at least two insurance policies to protect its clients funds. Clearly Hiscox could have included defalcation, misappropriation, and embezzlement as exclusions in the policy if it wanted to. These specifically would have excluded Haarstad's actions. As can be seen in the cases cited by Hiscox, these exclusions are often found in insurance policies.

[¶51] Because CPM has set forth facts set in support of its claim which would entitle it to relief, dismissal under Rule 12(b)(6) is also inappropriate.

## II.     The "Insured vs. Insured" Exclusion Does Not Bar Coverage for the Underlying Claims.

[¶52] Hiscox has not met its burden to prove the exclusion applies in this case. Notably, no mention is made in the Complaint as to the relationship between the 54 entities and CPM. Hiscox argues the policy excludes coverage of at least 33, if not all, of the 54 claimants in this matter because they were brought by "affiliates" and Section V(E) of the Policy provides it does not cover claims "brought by one Insured against another Insured or brought by any Affiliate or by any Joint Venture in which the Insured participates, as against any Insured." (Doc. ID # 1-1, p. 19). The declarations sheet declares the named insured to be "Campbell Property Management, LLC." (Doc. ID # 1-1, p. 13).

[¶53]   The Policy defines "affiliate" as "any person or entity, which is related to any Insured through common ownership, control or management." (Doc. ID # 1-1, p. 16).

[¶54] Common ownership is not defined in the Policy. The IRS has defined "common ownership" as meaning greater than 50% ownership by the same related party interests."[3]

[¶55] This exclusion is not applicable in this matter. CPM does not share "common ownership, control or management" with any of its clients that have submitted Notices of Claim. CPM does not hold any equity interest in any of the 54 separate business entities. CPM is a separate company and is not a member of any of the 54 separate entities. It is a third-party vendor providing property management services to these 54 separate entities. CPM is simply a provider of services to these entities. Preclusion or limitation of coverage based upon this Exclusion is erroneous. Not

---

[3] Common ownership and defined under IRC § 482, can be found at:
https://www.irs.gov/pub/default_path_no_value/iso_c_01_02.pdf

to be forgotten, the named insured is Campbell Property Management, LLC, who has no ownership affiliation with any of the 54 client entities.

[¶56] North Dakota respects the fact that an LLC is a separate entity from any of its members. The North Dakota Supreme Court has vigorously upheld the separation of a business entity from its business owners. Coughlin Const. Co. Inc., v. Nu-tec Industries, Inc., 755 N.W.2d 867 (ND 2008); Taszarek v. Lakeview Excavating, Inc., 883 N.W.2d 880, 883 (ND 2016).

[¶57] Nevertheless, even if any of the 54 entities that are CPM's clients are Affiliates, the exclusion still does not apply. The exclusion precludes coverage for claims brought by affiliates in which the insured participates. CPM does not participate in any of the 54 entities, and therefore, the exclusion does not apply. Accordingly, Hiscox has wrongfully disclaimed coverage under this provision.

[¶58] Hiscox argues that because David Campbell is both president of CPM and has some ownership interests in the 54 entities that this somehow imputes a relation in "common ownership, control or management" on CPM. Nevertheless, Hiscox has failed to submit any admissible evidence to support its allegation that David Campbell participates in any of the 54 client entities. Notably, there is no mention of David Campbell or his alleged participation anywhere in the Complaint. Moreover, Hiscox's inclusion of the 54 claims notices in its Rule 12(b)(6) motion does not provide any evidence of common ownership, control, or management as to the 54 entities and CPM. As such, summary judgment on this issue is inappropriate.

[¶59] In addition, insofar as the Court treats its motion under Rule 12(b)(6), Hiscox's argument still fails as the allegations pleaded in the Complaint must be taken as true:

- CPM is a named insured and it was providing professional services as defined within the policy.

- CPM did not hold any equity interest in any of the 54 separate business entities.

15

(Doc. ID # 1-1, pp. 6-7).

[¶60] Accordingly, Hiscox's motion to dismiss should be denied.

### III.   Hiscox is the Proper Defendant.

[¶61] Hiscox argues "Hiscox, Inc." is an improper defendant in this action "because that company did not enter into a contract with CPM." (Doc. ID # 3, p. 10). Hiscox contends it is an "administrative agent" for the Underwriter of the policy, Lloyd's Syndicate 3624, and therefore, Hiscox has no obligation to defend indemnify, or perform any other action under the policy.

[¶62] Hiscox argument has no merit. The insurance agreement entered by CPM was made with Hiscox Inc., signed by a Hiscox representative, and *effective* with Underwriters at Lloyd's London. (Doc. ID # 1-1, p. 13).

> The Certificate terms and conditions contained herein or endorsed hereon and such other provisions, agreements or conditions as may be endorsed hereon or added hereto are hereby incorporated in this Certificate. No representative of the Underwriters shall have power to waive or be deemed to have waived any provision or condition of this Certificate unless such waiver, if any, shall be written upon or attached hereto; nor shall any privilege or permission affecting the insurance under this Certificate exist or be claimed by the Insured(s) unless so written or attached.
>
> IN WITNESS WHEREOF this Certificate has been signed at New York, New York
>
> Hiscox Inc.
>
> Notice: 1. an insurer that is not licensed in this state is issuing the insurance policy that you have applied to purchase. These companies are called "nonadmitted" or "surplus lines" insurers. 2. The insurer is not subject to the financial solvency regulation and enforcement that applies to licensed insurers in this state; 3. These insurers generally do not participate in insurance guaranty funds created by state law. These guaranty funds will not pay your claims or protect your assets if the insurer becomes insolvent and is unable to make payments as promised. 4. Some states maintain lists of approved or eligible surplus lines insurers and surplus lines producers may use only insurers on the lists. Some states issue orders that particular surplus lines insurers cannot be used. 5. For additional information about the above matters and about the insurer, you should ask questions of your insurance producer or surplus lines producer. You may also contact your insurance department consumer help line.

(Doc. ID # 1-1, p. 14).

[¶63] Significantly, Hiscox's website boasts "America's #1 online small business insurer."[4] In addition, Hiscox's website[5] purports:

> Our companies in the US include Hiscox Insurance Company Inc., and its general agent, Hiscox Inc. Hiscox Insurance Company Inc. is a Chicago, IL domiciled insurer admitted or licensed to do business in all 50 states and the District of Columbia. Hiscox Insurance Company Inc. is rated A (Excellent)[1] by A.M. Best with a group financial size

---

[4] https://www.hiscox.com/small-business-insurance?medium=tsa&_vsrefdom=2018031501&gclid=CjwKCAiAo8jgBRAVEiwAJUXKqBI3SlrYN_8f7bsdfhZJh4p9wpcHJ--40dBiupQdIgH8bMJ6Iz0I3hoCvCQQAvD_BwE&gclsrc=aw.ds

[5] https://www.hiscox.com/about-hiscox-insurance

16

category (FSC) of XV ($2 Billion or greater), proving we have strong capital reserves.

Hiscox Inc., a DE corporation that does business in California as Hiscox Insurance Agency, is an approved Lloyd's cover holder and underwrites surplus lines business on behalf of Lloyd's Syndicates 33 and 3624...Lloyd's syndicates are restricted in doing business in the USA and its territories as they are not US-based insurers. The business we write on behalf of Lloyd's Syndicates 33 and 3624 in the US is placed by licensed surplus lines insurance brokers.

[¶64] As Lloyd's London is restricted from doing business in North Dakota, Hiscox, as an insurance company, entered into an insuring agreement with CPM. The Certificate of Insurance and all subsequent endorsements are signed by Hiscox representatives, Hiscox has provided CPM with "Policyholder" notices, and Hiscox directed CPM to direct any complaints or comments regarding the policy to "Legal Department, Hiscox USA, 520 Madison Avenue, 32nd Floor, New York, NY 10022" or to us_helpdesk_rfl@hiscox.com. (See Doc. ID # 1-1, pp. 14, 27, 29-41).

[¶65] Lloyd's London is merely the Underwriter of the policy, and such fact does not negate liability on behalf of the insurance company that administered the policy, Hiscox.

[¶66] Accordingly, as Hiscox Inc. is the insurance company which has provided a policy to CPM, Hiscox is the proper defendant in this case.

IV.   Hiscox Has Disclaimed Coverage in Bad Faith.

[¶67] North Dakota recognizes bad faith as a cause of action. See generally Fetch v. Quam, 2001 ND 48, ¶ 11, 623 N.W.2d 357, 361. "Whether an insurer has acted in bad faith is ordinarily a factual question to be determined by the trier of fact." Id. at ¶ 12.

[¶68] CPM has been fully cooperative throughout this case. Every question has been answered, and CPM has been forthcoming with information about its claim. Insofar as Hiscox alleges it has not acted in bad faith, it has failed to provide any evidence to that effect.

17

Because issues of faith are questions of fact and Hiscox has not submitted any admissible evidence to dispute the claim, summary judgment is inappropriate.

[¶69] Insofar as the motion is taken under Rule 12(b)(6), Hiscox claim must fail as the following allegations in the Complaint must be taken as true:

- Hiscox owes to Campbell Property Management, as its insured, duties to act fairly and in good faith.

- Hiscox's duties require fair dealing and good faith in paying claims made by its insureds and providing coverage.

- Hiscox failed to provide coverage for Campbell Property Management and failed to compensate Campbell Property Management, without proper cause, for a loss covered under the Policy relying upon unreasonable interpretation of the policy.

- Campbell Property Management provided available and necessary documents to Hiscox in order to substantiate its claim. Multiple times Campbell Property Management has communicated its reasonable interpretation of the Policy to Hiscox.

- Hiscox has breached its duties of good faith owed to Campbell Property Management and has caused damages and liability to Campbell Property Management.

- Campbell Property Management is entitled to its economic and noneconomic damages in addition to the policy amount owed.

(Doc. ID # 1-1, pp. 9-10).

[¶70] For all the reasons stated herein, because CPM has made valid claims for coverage and Hiscox has relied on conclusory allegations and arguments to deny coverage, Hiscox has disclaimed coverage in bad faith.

## CONCLUSION

[¶71] For the foregoing reasons, CPM respectfully requests this Court deny Hiscox's motion.

Dated this 17th day of December, 2018.

Ronald H. McLean (ND #03260)
Kasey D. McNary (ND #06590)
SERKLAND LAW FIRM
10 Roberts St. N. | PO Box 6017
Fargo, North Dakota 58108-6017
Phone: (701) 232-8957
*rmclean@serklandlaw.com*
*kmcnary@serklandlaw.com*
*ATTORNEYS FOR PLAINTIFF*
*CAMPBELL PROPERTY MANAGEMENT, LLC*

## IN THE UNITED STATES DISCRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## EASTERN DIVISION

| | |
|---|---|
| Campbell Property Management, LLC.,<br><br>                                  Plaintiff,<br><br>        vs.<br><br>Hiscox, Inc.,<br><br>                                  Defendant. | **Case No. 3:18-cv-00237-DLH-ARS** |

## CERTIFICATE OF SERVICE

[¶1]    I hereby certify that on December 17, 2018, the following document:

1. **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANT'S MOTION TO DISMISS**

were served electronically on the following:

**CAHILL LAW OFFICE**
Scott M. Strand
scott@cahill-lawyers.com

**CLYDE & CO US LLP**
Scott F. Bertschi
Scott.bertschi@clydeco.us
Brandon R. Gossett
Brandon.gosset@clydeco.us

Dated this 17th day of December, 2018.

/s/Ronald H. McLean
Ronald H. McLean (ND #03260)
SERKLAND LAW FIRM
10 Roberts St. N. | PO Box 6017
Fargo, North Dakota 58108-6017
Phone: (701) 232-8957
rmclean@serklandlaw.com
ATTORNEYS FOR CLIENT
DAVID CAMPBELL